UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

BHUPINDER DHILLON,
an individual and resident of British
Columbia, Canada,

         Plaintiff,

    v.

BBC HOLDINGS INC., a Washington
corporation; BBC BROADCASTING
INC., a Washington corporation; BHAG
SINGH KHELA, an individual and
resident of Washington ,

         Defendants.

_____

BBC HOLDINGS INC., a Washington
corporation; BBC BROADCASTING
INC., a Washington corporation,

         Third-Party
         Plaintiffs,

    v.

SUKHDEV SINGH DHILLON, an
individual resident of Alberta, Canada,

         Third-Party
         Defendant.

CASE NO. C07-168BHS

FINDINGS OF FACT,
CONCLUSIONS OF LAW,
AND ORDER

## I. INTRODUCTION

This matter came before the Court on a bench trial conducted on December 17,

2008, February 10 and 11, 2009, and February 24, 2009. Dkts. 60, 66, 67, and 70. Trial

was interrupted due to inclement weather that caused the United States District

Courthouse in Tacoma to be closed on December 18, 19, and 22, 2008. As a result, trial

was resumed on the next dates available for the Court and counsel. The Court considered the testimony of witnesses at trial, all exhibits and deposition testimony admitted into evidence at trial, the parties' trial briefs, post-trial briefs, and the files and records herein. The Court finds for the Defendants and enters the following Findings of Fact, Conclusions of Law, and Order.

## II.  DECISION SUMMARY

The Plaintiff presented a very tragic and compelling story of the destruction of what had been strong family bonds between the related Dhillon and Badh families who had emigrated from their native India to British Columbia, Canada. The fracture of these familial ties arose out of a series of commercial transactions in which Plaintiff Bhupinder Dhillon provided funds to assist his son, Sukhdev Singh Dhillon ("Dave Dhillon"), to further his business plan to provide radio programming in the Punjabi language that would be transmitted from Ferndale, Washington into the Punjabi-speaking community residing in southern British Columbia, Canada. The plan entailed the enlistment of Dave Dhillon's cousin Sukhvinder S. Badh ("Suki Badh") and other Badh family members in financing the acquisition of a radio station and real estate. Plaintiff asserted that Dave Dhillon represented to him that, in exchange for Plaintiff investing $400,000 in these assets, he would receive a 40% interest in each of two companies, BBC Broadcasting, Inc. ("BBC Broadcasting"), the company that was to own the radio station business assets, and BBC Holdings, Inc. ("BBC Holdings"), the company that was to own the real property on which BBC Broadcasting would operate. Dave Dhillon's plan included his formation and ownership of RPI Radio Punjab International, Inc. ("Radio Punjab") that would purchase air time from BBC Broadcasting for 24 hours, seven days a week.

The Plaintiff in this case had the burden of proving that he invested in the two companies. He failed to meet this burden. In order to prevail, Plaintiff would have had to prove that his son had either express, implied, or apparent authority as a representative of the two companies to bind them to an oral agreement in which Plaintiff would become a

40% shareholder in each of the companies in return for Plaintiff making a payment of $400,000 to the companies, or on the companies' behalf, in connection with the purchase of assets to be owned by the two companies. The evidence produced at trial presented a picture of very loose business accounting procedures and informal business practices. There was virtually no credible evidence that there had been express authority given to Dave Dhillon to enter into such an arrangement with his father and the companies. Therefore, Plaintiff's ultimate success in this case depended upon his persuading the Court that Dave Dhillon had implied or apparent authority to bind the companies to the arrangement that would put Plaintiff in an ownership position.

In the findings of fact herein there are a number of facts that warrant the Court's declination to accept the implied authority theory of recovery, but perhaps the most telling of all was the inconsistent positions taken by Plaintiff in his attempts to assert his rights through demands, made by his Canadian attorney Miriam Vale. In June 2005 she sent a demand letter for repayment of a loan, to Jasbir S. Badh, Gurdial S. Badh, Sukvinder S. Badh, Ajit S. Badh and Surrinder K. Badh. The letter made no mention of either an indebtedness by the two companies or an assertion of ownership in those companies. The inconsistency was compounded by Dave Dhillon, who Plaintiff depended upon to corroborate his claim in this lawsuit, and Radio Punjab bringing a lawsuit in October 2005 in the Supreme Court of British Columbia against BBC Broadcasting, BBC Holdings, Sher-E-Punjab Radio Broadcasting, Inc., Rajinder S. Saini, Jasbir S. Badh, Suriner K. Gadh, Sukhvinder S. Badh, Ajit S. Badh, Gurdial S. Badh and Bhag S. Kehla. In that suit Dave Dhillon alleged, inter alia, that Mr. Kehla was to hold the shares in BBC Broadcasting and BBC Holdings in trust for Dave Dhillon (not Plaintiff) and Sukhvinder Badh. Again, there was no assertion that Plaintiff had any interest in the two companies or was the beneficiary of any trust. Neither was there any allegation that the amount that had been asserted in the June 2005 letter was, in fact, owed to Plaintiff as a loan.

It may be that Plaintiff received assurances from his son that he would enjoy ownership in the two BBC companies, but the Court cannot rule in Plaintiff's favor based upon what might have happened in the formation of the companies and the acquisition of the assets of the companies.[1]  The Court cannot find that Plaintiff in 2002 had any clear understanding of what it was that he was to receive in exchange for the $400,000 he provided at or near the time of closing the sale of assets. The Court finds that the testimony of several witnesses was credible in some aspects and not credible in others. Certainly the business practices of Radio Punjab, BBC Broadcasting and BBC Holdings and the attendant informality and departure from a prudent creation and retention of business and accounting records exacerbated the lack of a fully coherent history of the companies and related commercial transactions as provided through the testimony of Mr. Kehla and the various members of the Dhillon and Badh families.

It is very unfortunate and a hard lesson that this case provides on the importance of making and maintaining business records and on the resulting harm to those businesses, and individuals associated with them, who ignore this fundamental principle.

The Court now makes the following additional findings of fact and specific conclusions of law.

### III. JURISDICTION

The Court has jurisdiction over the parties and has subject matter jurisdiction by virtue of 28 U.S.C. Section 1332, in that there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds the jurisdictional minimum for an exercise of diversity jurisdiction.

---

[1]Indeed, Plaintiff stated in his rebuttal closing brief, "It may be true that Dave Dhillon, on behalf of Holdings and Broadcasting, was less than candid with his father, Bhupinder Dhillon, about what Holdings and Broadcasting would do if Bhupinder Dhillon gave Holdings and Broadcasting $400,000.00." Dkt. 78 at 3.

# IV. FINDINGS OF FACT

## A.  Parties

1.  Plaintiff is a citizen of British Columbia, Canada.

2.  Defendants and Third-Party Plaintiffs BBC Holdings and BBC Broadcasting (jointly, "the BBC Companies") are Washington corporations, with their principal places of business in Washington, and therefore are citizens of Washington.

3.  Since July 2002 the BBC Companies have been in the business of owning and operating Radio Station 1550-AM in Ferndale, Washington.  BBC Holdings owns the real property on which the radio station is located and the improvements to that real property.  Ex. 8.  BBC Broadcasting owns the radio station's FCC license, the broadcasting facilities, and the intangible assets used by the radio station in the ongoing operation of its business.  Ex. 9.

4.  BBC Holdings rents its real property and improvements to BBC Broadcasting.  BBC Broadcasting leases airtime to independent programmers who wish to broadcast their programming and sell advertising that is broadcast to the listening audience as part of that programming.  BBC Broadcasting does not originate any of its own programming, and its only source of revenue is the leasing of airtime to others.

5.  Defendant Bhag Singh Khela ("Mr. Khela") is a resident of Kent, Washington and is a citizen of Washington.  Mr. Khela has been a director, officer, and shareholder of each of the BBC Companies since their formation in February 2002.

6.  Third-Party Defendant Dave Dhillon is a citizen of Canada.  Because he filed for bankruptcy protection in Canada, and in accordance with Plaintiff's and Defendants' Stipulation Regarding Bankruptcy Filing by Third-Party Defendant and Mediation Deadlines (Dkt. 43), this Court stayed the third-party action against Dave Dhillon by Order dated November 18, 2008.  Dkt. 45.

**B.     Radio Punjab**

7.      Radio Punjab is a British Columbia company that, during the relevant time period, has been in the business of broadcasting Punjabi-language radio programs to listening audiences located primarily in southwestern British Columbia.  Radio Punjab never has owned its own radio station or broadcasting facility, but rather leases airtime from others.  Radio Punjab makes monthly payments for its lease of airtime from radio stations.  Radio Punjab generates its own revenues and income exclusively through the sale of broadcast advertising that airs with its programming.  Radio Punjab has always been a separate and distinct legal entity from the BBC Companies.

8.       Dave Dhillon was the founder, the principal shareholder, and the manager of Radio Punjab at all relevant times.  Dave Dhillon has been in the radio business since 1993 and is familiar with the custom and practice whereby radio programmers such as Radio Punjab lease airtime from owners of radio stations such as BBC Broadcasting.  He testified that the standard in the industry is for the programmer to enter into a lease agreement for airtime which typically provides for termination of the lease if payments are not made.  Tr. 75-81.

9.      Mr. Khela never has had an ownership interest or other financial interest in Radio Punjab.

**C.     Badh Family Members**

10.      Suki Badh has been a director, officer, and shareholder of each of the BBC Companies during all relevant time periods, since each company's formation in February 2002.

11.      Surinder Badh is Plaintiff's sister, making Plaintiff the uncle of Suki Badh, and making Dave Dhillon Suki Badh's cousin.

**D.     BBC Companies' Purchase of Radio Station KCCF**

12.      In late 2001, Dave Dhillon was looking for an alternative radio station over which Radio Punjab could broadcast its programming.  This was because the owner of the

radio station over which Radio Punjab had been broadcasting its programming had reduced Radio Punjab's airtime. In late 2001, Jimmy Arbona, the manager of that radio station, advised Dave Dhillon that Radio Punjab's lease payment would be increased to $100,000 per month. Dave Dhillon testified that Radio Punjab would not pay that rate, and therefore he was looking for an alternative station on which to lease airtime. Tr. 81-84.

13.    In late 2001, Dave Dhillon identified Radio Station KCCF, 1550-AM, in Ferndale, Washington, as a station that potentially could be an alternative for Radio Punjab, and learned that the current owner of Radio Station KCCF might be in the market to sell the station. However, neither Dave Dhillon nor Radio Punjab could afford to purchase it.

14.    Dave Dhillon encouraged his cousin Suki Badh to purchase Radio Station KCCF, with the expectation that, after acquisition by his cousin, Dave Dhillon would arrange for Radio Punjab to lease all of the station's airtime, subject to monthly lease payments in an amount less than Radio Punjab would have to pay at its existing station. Dave Dhillon enlisted his cousin Suki Badh to acquire Radio Station KCCF so that Radio Punjab would have the opportunity to broadcast its programming over the station in an amount less than the $100,000 that Mr. Arbona would require. Tr. 84, 95.

15.    Suki Badh agreed to pursue the acquisition of Radio Station KCCF.

**E.    Formation of the BBC Companies and Earnest Money Transaction to Acquire Radio Station KCCF**

16.    On February 7, 2002, the BBC Companies were incorporated under Washington law by corporate attorney Tim Carpenter of Bellingham, Washington. Mr. Carpenter was involved in preparing all of the corporate documents for the BBC Companies (Tr. 406), and that he took instructions from both Dave Dhillon and Suki Badh. Tr. 409.

17.    On that same day, (a) BBC Broadcasting entered into an Asset Purchase Agreement with Pearl Broadcast Corporation ("Pearl") to acquire the assets of Radio

Station KCCF for $600,000 (Ex. 8), and (b) BBC Holdings entered into a Commercial Real Estate Purchase and Sale Agreement with Pearl to acquire the land on which the radio station is situated and improvements for $900,000 (Ex. 9) (jointly "the Purchase Agreements").

18.     Payment of $100,000 in nonrefundable earnest money to Pearl was made on behalf of the BBC Companies by Suki Badh, via a February 14, 2002, check from corporate counsel for the BBC Companies to Stewart Title, which provided escrow services for the purchase.

19.     Dave Dhillon was a director of the BBC Companies for only a few days in order to facilitate Mr. Carpenter's registration of the corporations with the Washington Secretary of State.  Dave Dhillon was a director from February 7-11, 2002, because Dave Dhillon, given the relationship Radio Punjab would have as the sole and exclusive customer of BBC Broadcasting, felt it would be a "conflict of interest" for him to be a director of either of the BBC Companies.  Tr. 89.  He "designed" the structure whereby he would not be a director.  Tr. 90.  Carpenter used his name in order to get the documents filed with the State of Washington.  Tr. 444.

## F.     Issuance of Shares in BBC Holdings

20.     As reflected in the February 11, 2002, Minutes of Organizational Meeting of BBC Holdings, shares in BBC Holdings were issued as follows:

> 80 shares to Suki Badh
>
> 20 shares to Mr. Khela[2]

Suki Badh and Mr. Khela were elected the sole directors of the company, and the Board of Directors appointed Suki Badh president and treasurer, Dave Dhillon vice president, and Mr. Khela secretary.

---

[2]Plaintiff in his rebuttal closing brief asserts that no consideration was provided for these shares. The record is not clear on this point, but this is not an issue that must be resolved in this case.

21.     The Minutes of Organizational Meeting of BBC Holdings were prepared by attorney Tim Carpenter and signed by Messrs. Badh and Khela.  Ex. 10.

22.     Stock certificates for shares of BBC Holdings were created by attorney Tim Carpenter and were issued in the name of Suki Badh (80 shares) and Mr. Khela (20 shares).  The certificate for 80 shares issued to Suki Badh was signed by Mr. Badh and Mr. Khela as President and Secretary, respectively, on January 24, 2003.  Ex. A-5.  The certificate for 20 shares issued to Mr. Khela was signed by Mr. Khela and Suki Badh as President and Secretary, respectively, on February 11, 2002.  Ex. 11.  Copies of the original signed stock certificates for all shares of BBC Holdings were admitted into evidence as Ex. 89.

23.     There was no evidence adduced at trial that any other shares were actually issued by BBC Holdings at any time other than as originally issued.  Attorney Tim Carpenter testified that as far as he knew, none ever were.  Tr. 433-39, 464.

**G.     Issuance of Shares in BBC Broadcasting**

24.     As reflected in the February 11, 2002, Minutes of the Organizational Meeting of BBC Broadcasting, shares in BBC Broadcasting were issued as follows:

80 shares to Mr. Khela

20 shares to Suki Badh

Suki Badh and Mr. Khela were elected the sole directors of the company, and the Board of Directors appointed Mr. Khela president and treasurer, Dave Dhillon vice president, and Suki Badh secretary.

25.     The Minutes of Organizational Meeting of BBC Broadcasting were prepared by attorney Tim Carpenter and signed by Messrs. Khela and Badh.  Ex. 12.

26.     Stock certificates for shares of BBC Broadcasting were created by attorney Tim Carpenter and were issued in the name of Suki Badh (20 shares) and Mr. Khela (80 shares).  Copies of unsigned certificates were admitted into evidence.  Ex. A-6 for Badh shares and Ex. 13 for Khela shares.  During trial, the original certificates were located and

were admitted into evidence showing that the certificate for 80 shares issued to Mr. Khela was signed by Mr. Khela and Suki Badh as President and Secretary, respectively, on November 14, 2002, and that the certificate for 20 shares issued to Suki Badh was signed by Suki Badh and Mr. Khela as President and Secretary, respectively, also on November 14, 2002. Ex. A-32. Copies of the original signed stock certificates for all shares of BBC Broadcasting also were admitted into evidence as Ex. 89.

27. Although Suki Badh initially recalled signing the BBC Broadcasting certificates in February 2002, rather than nine months later in November 2002, a transmittal letter from Mr. Carpenter to Suki Badh dated October 31, 2002, indicated that Mr. Carpenter did not transmit the BBC Broadcasting shares to the officers for signature until November of 2002. Ex. A-34. This refreshed Suki Badh's recollection that the certificates were not signed until November 2002. Tr. 715-17.

28. There was no evidence adduced at trial that any other shares were issued by BBC Broadcasting at any time other than as originally issued. As far as attorney Tim Carpenter knew, none ever were. Tr. 433-39, 464.

29. For FCC purposes, it was necessary that BBC Broadcasting have a U.S. resident as majority shareholder, and Mr. Khela is a Washington resident. He agreed to be a majority shareholder of BBC Broadcasting for this purpose and to also be a minority shareholder of BBC Holdings.

**H.     Financing and Closing of the BBC Companies' Purchase of Radio Station KCCF**

30. Over the next several months following February 2002, the BBC Companies sought to secure financing for a portion of the purchase price and Dave Dhillon participated in trying to line up financing. Dave Dhillon was not going to be an investor, but he had an interest in having the deal close because of Radio Punjab's interest in leasing airtime from BBC Broadcasting, once it acquired the assets of Radio Station KCCF.

31.     Suki Badh asked Dave Dhillon to help arrange financing and to assist in negotiations with Pearl.  Dave Dhillon agreed and was involved.

32.     Attorney Tim Carpenter dealt with both Dave Dhillon and Suki Badh, and he understood they were both involved in the effort to have the BBC Companies acquire Radio Station KCCF.  Tr. 405, 409.

33.     Dave Dhillon had no authority to solicit investors for the BBC Companies. Additionally, the Bylaws for each of the BBC Companies required the board of directors to authorize the transfer of any shares and required a majority vote of all shareholders for the issuance of any additional shares.  Neither Suki Badh nor Mr. Khela, individually or in their capacity as directors, ever asked or authorized Dave Dhillon to solicit investors.[3]

34.     Due to difficulty in securing financing, the transactions were in danger of not closing.  Pearl agreed to extend the closing date to July 24, 2002, provided that the BBC Companies pay an additional $400,000 in a nonrefundable deposit, with half to be paid by July 3 and the other half by July 10.  The BBC Companies agreed to the increased $500,000 earnest money deposit.  The deadline for closing was therefore extended to July 24, 2002.

## I.     Advance on Radio Punjab Lease Payments

35.     Radio Punjab entered into a written broadcast lease agreement with BBC Broadcasting ("Radio Punjab Lease Agreement"), with lease rates of $40,000 monthly for the first two years and $60,000 per month for the third year.  Tr. 628.  Both of the percipient witnesses, Dave Dhillon and Suki Badh, agreed that the written lease agreement existed and was signed, although Dave Dhillon apparently regarded it as an oral lease and the parties differed in whether the monthly lease payment was to be made

---

[3]Plaintiff urges the Court to find that Dave Dhillon was given authority to obtain investors by citing in his rebuttal closing brief that Dave Dhillon and Suki Badh together solicited Rajbir Sandhu as a potential investor. If anything, this evidence demonstrates that Dave Dhillon required one of the BBC company principals to be present to bind the companies. Dkt. 78 at 6.

in U.S. funds or Canadian funds.  Tr. 59, 84, 331. In exchange for its monthly lease payments, Radio Punjab would have the exclusive right to broadcast its programming over 1550-AM (through which Radio Punjab would generate advertising revenue).  Dave Dhillon acknowledged that it was standard procedure in the industry for broadcast lease agreements to include a termination provision in the event of delinquency or nonpayment of lease payments.  Tr. 76-81.  He also acknowledged that Radio Punjab's written agreement with BBC Broadcasting had such a termination clause.  Tr. 85.  Radio Punjab was required to advance a full year of lease payments in the amount of $480,000.

36.    In July 2002, Dave Dhillon on behalf of Radio Punjab arranged for $400,000 that would be put toward the BBC Companies' purchase from Pearl and would constitute Radio Punjab's advance on lease payments.  He could not raise the full $480,000 advance.  In recognition of the $400,000 advance lease payment, the fact that the advance was $80,000 short of the full $480,000, and BBC Broadcasting's need for current revenue to cover operating expenses, it was agreed that Radio Punjab would still make monthly lease payments during the first year, with any deficit covered by drawing down the advance.

37.    During the period of late-July 2002 through mid-December 2004, Radio Punjab's programming was broadcast over BBC Broadcasting's 1550-AM.  Radio Punjab was BBC Broadcasting's only customer during that time; its Punjabi-language programming was the exclusive programming broadcast by the radio station; and it was the sole source of revenue for BBC Broadcasting.  Radio Punjab sold advertising, and those revenues were paid to Radio Punjab.  Tr. 88-89.  During that 2-1/2-year period, Radio Punjab made sporadic lease payments in varying amounts, with the advance drawn down month-after-month to satisfy the shortfall.  Exs. A-23 and A-25.

38.    In the summer of 2004, Radio Punjab programming was shut down by BBC Broadcasting for several hours to emphasize to Dave Dhillon the need to bring the account current.  In August 2004, Dave Dhillon indicated to Suki Badh and Mr. Khela

that his ventures into the nanny business, the restaurant business and satellite TV business would create revenues sufficient for him and Radio Punjab to keep current and to repay his father. Tr. 354.

39.     By December 2004, the $400,000 advance had been exhausted and Radio Punjab was behind in unpaid lease obligations net of the advance.  As a result, effective December 2004, the Radio Punjab Lease Agreement was terminated for non-payment of monthly fees.

40.     Evidence of Radio Punjab's lease payments for airtime on Radio Station KCCF was admitted showing all payments received by BBC Broadcasting (Exs. A-23 and A-25.)  In addition, Jasbir Badh made an unsophisticated accounting of the lease payments owed and paid, and the unpaid balance, and the Declaration of Jasbir Badh filed in Whatcom County Superior Court described the accounting in detail.  Ex. A-33. Whether Jasbir Badh accounted for all of Radio Punjab's payments contemporaneously and accurately is not completely clear. The Whatcom County Declaration describes the status of those payments.  Tr. 595-97, 601.

41.     BBC Broadcasting sought relief in Whatcom County Superior Court for the State of Washington to recover from Radio Punjab the balance of unpaid lease payments net of all payments received, including the $400,000 advance.  Neither Radio Punjab nor its principal Dave Dhillon appeared in the lawsuit to defend that claim, and on January 30, 2009, a Default Judgment was entered for the unpaid balance.  Ex. A-30.

**J.     Payment of the $400,000 Advance**

42.     Radio Punjab's $400,000 lease advance was made in three payments, and was used by the BBC Companies to fund the purchase from Pearl.  On July 3, 2002, Dave Dhillon wired $100,000 directly to Pearl.  On or about July 10, 2002, Dave Dhillon provided another $100,000 directly to Stewart Title.  Finally, on July 23, 2002, Dave Dhillon delivered $200,000 to Jasbir Badh in the form of a bank draft drawn on Khalsa Credit Union.

43.     There was no indication in any of the three transfers of funds that the money came from Dave's father, Plaintiff Bhupinder Dhillon. Tr. 691-92. Although the testimony at trial was not entirely consistent, it was clear that Dave Dhillon was involved in procuring his father's funds and that his father permitted Dave to transfer such funds by providing him a signed but otherwise blank check and by authorizing Dave to withdraw funds from a line of credit at his credit union. Tr. 64, 103-05, 153.

44.     Neither Suki Badh nor Mr. Khela, directors of the BBC Companies at the time of closing, were aware that Plaintiff was the source of the $400,000. Given the manner in which the funds were advanced (a wire payment by Dave Dhillon directly to Pearl, a payment by Dave Dhillon directly to Stewart Title, and a Khalsa Credit Union bank draft) there was no indication that the funds originated from Plaintiff, nor did Dave Dhillon tell Mr. Khela or Suki Badh (or any other members of the Badh family) that the funds originated from Dave Dhillon's father.

45.     Defense witnesses testified that they did not learn until at least two years later that Dave Dhillon had obtained funds used by Radio Punjab from his father. Tr. 358-59, 529.

46.     Plaintiff consistently has been willing to provide funds to Dave Dhillon any time he got into financial trouble or otherwise needed money. Tr. 74-75.

**K.     Plaintiff's Understanding of the Purpose of the Funds**

47.     There was no credible evidence that either Mr. Khela, Suki Badh, Jasbir Badh or Gurdial Badh had any discussions at any time with Plaintiff about investing in the BBC Companies or about transferring shares, or holding shares in trust for the benefit of, Plaintiff.

48.     Plaintiff's testimony as to the nature of the business and the circumstances of his transfer of funds was somewhat confused. The preponderance of the evidence suggests that Plaintiff did not readily distinguish between Radio Punjab and the BBC Companies and suggests that he conflated the two different businesses in his mind. For

instance, he referred to "running the radio station" for his son in late 2002, when the evidence is clear that he was operating Radio Punjab only at that time, not the BBC Companies. Tr. 165. Plaintiff also was unsure whether the Badh family members were owners of Radio Punjab by virtue of Suki Badh's ownership interest in the BBC Companies. Tr. 174-76. Plaintiff thought he was investing in a "radio station" and that he was one of several "partners in a radio business" when the evidence is clear that the radio business was composed of two distinct entities: (a) the programming heard over the airwaves that generated revenue for Radio Punjab through sale of advertising, and (b) the operation of the broadcasting facility itself by the BBC Companies, which leased airtime to Radio Punjab. Tr. 150. A July 2002 prayer meeting was conducted by the "partners in the radio business," without distinguishing between the two different businesses. Tr. 160. Similarly, Plaintiff failed to distinguish between the two different businesses when recounting the "Radio Punjab Appreciation Night" held in December 2002. He testified that the celebration was to honor those who invested in "AM-1550 " and who were "partners in the radio station," without distinguishing between Radio Punjab and the BBC Companies. The Court finds that such confusion is consistent with Plaintiff providing funds to his son with an understanding on his part that they would be invested in the radio business generally. In fact, they were used to pay for the radio business as Radio Punjab's lease advance, rather than as an equity investment in the BBC Companies.

49. At the time he provided the funds, Plaintiff was likely unsure about what they would be used for, beyond use in the radio business. When deposed on November 1, 2007, Plaintiff was unsure with whom he talked about transferring his money at the time it was transferred; he did not recall who he talked to about transferring his money at the time because it was five years prior; he did not remember who asked him to invest because it was a long time ago; Suki Badh and Jasbir Badh said "nothing" to him about investing in the BBC Companies; he did not know what Mr. Khela ever said to him about investing; he did not remember what, if anything, Suki Badh ever said to him about

investing. Tr. 179-85.  The Court finds that such confusion is consistent with Plaintiff

providing funds to his son which he understood his son needed for his radio business, but

which were not explicitly intended by Plaintiff to be an equity investment in the BBC

Companies.

50.     Plaintiff provided funds to his son because he "trusted" him.  Tr. 172.

51.     In 2005, Plaintiff's British Columbia legal counsel sent two demand letters

insisting that Plaintiff had loaned $300,000 to "the Badh family."  Although untrue, the

letters suggest that in June and July, 2005, Plaintiff did not believe he had "invested" in

the BBC Companies.  The correspondence from Plaintiff's British Columbia legal

counsel also indicated that Plaintiff had made previous demands for repayment of the

"loan" in January and March 2005.

52.     In March 2005, Dave Dhillon initiated a lawsuit in British Columbia ("B.C.

lawsuit"), in which he claimed that he – Dave Dhillon – "invested" $400,000 in exchange

for a 40% equity interest in the BBC Companies.  Although untrue, the lawsuit suggests

that in March 2005, Dave Dhillon did not believe his father had invested in the BBC

Companies.  In June 2005, Dave Dhillon filed a Statement of Claim in his B.C. lawsuit

and in November 2005 he filed an Amended Statement of Claim in his B.C. lawsuit, both

contending he – not his father – had invested in the BBC Companies.

**L.     Dave Dhillon's Lack of Authority to Issue or Transfer Shares**

53.     In 2002 Dave Dhillon was appointed vice president of each of the BBC

Companies, but he did not have authority to issue or transfer shares in either company.

Under the bylaws of each company, any transfer of shares must be authorized by the

board of directors, and the sale or issuance of additional shares beyond those originally

subscribed required majority shareholder approval.

54.     Neither Mr. Khela nor Suki Badh ever authorized Dave Dhillon to enter any

agreements calling for the transfer of any existing shares or issuance of additional shares.

Nor did either Mr. Khela or Suki Badh ever state, or otherwise manifest, to Plaintiff that Dave Dhillon had authority to transfer, sell, or issue shares in the BBC Companies.

55.     Dave Dhillon did not have authority to enter contracts on behalf of the BBC Companies with respect to the transfer, sale, or issuance of shares, nor did he have authority to bind Mr. Khela or Suki Badh to transfer their shares.

56.     Plaintiff could not have reasonably concluded that Dave Dhillon had implied or apparent authority to transfer, sell, or issue any shares in the BBC Companies. It is unlikely that Plaintiff had any clear understanding of what his relationship would be to either Radio Punjab, BBC Broadcasting or BBC Holdings at the time he authorized the transfer of $400,000 in July 2002.

**M.     Dave Dhillon's Unilateral Attempt to Change Ownership**

57.     For the period relevant to this case, there were no changes in the distribution of shares in either of the BBC Companies from the original issuance, recorded in the minutes of the February 11, 2002, Minutes of Organizational Meeting for each company.

58.     At the time the two companies were created, there were only two shareholders, Suki Badh and Mr. Khela. Dave Dhillon testified inconsistently on the issue of when, if ever, his father invested. Dave Dhillon first testified that as far back as February 2002, it was understood that Mr. Khela was holding shares "in trust" for Plaintiff. Tr. 50. Yet he later testified that Plaintiff had no entitlement to any shares in February 2002 because he had not provided any funds until July. Tr. 97. The Court finds that this inconsistency was never resolved and that it weighs in favor of discounting Dave Dhillon's credibility on the subject of when and whether there was a contract or agreement that allowed his father to invest in the BBC Companies.

59.     Dave Dhillon testified somewhat inconsistently on the issue of when, if ever, the parties agreed that shares would be transferred to Plaintiff. Dave Dhillon first testified that in February 2002 there was a meeting among himself, Suki Badh, Mr. Khela,

and attorney Tim Carpenter at which time "approval" was given by Suki Badh and Mr. Khela as directors and majority shareholders to transfer shares to Plaintiff. Tr. 92. Dave Dhillon later testified that it was in the summer of 2002 that a meeting occurred where he and Suki Badh went to Tim Carpenter together and instructed Mr. Carpenter to issue shares to Plaintiff. Tr. 116. Mr. Carpenter denied that any mention was made to him at any meeting of Plaintiff being entitled to shares either in February or the summer of 2002. The other three witnesses alleged to have been at that first meeting denied that such a meeting ever occurred. Mr. Carpenter, in fact, testified that he had did not recall ever meeting Mr. Khela prior to the day of Mr. Carpenter's testimony. Tr. 405. Moreover, Dave Dhillon attempted to bolster his testimony by referring to a ledger from Mr. Carpenter's office that listed Plaintiff as a shareholder of BBC Broadcasting. Dave Dhillon testified that he had a meeting with Mr. Carpenter where he advised Mr. Carpenter to correct the information because Mr. Khela was holding 40 shares in trust for Plaintiff. Tr. 63. Mr. Carpenter denied that such a meeting or conversation ever occurred, and he testified that the ledger was not his document and that it was inaccurate. Tr. 425, 440-41, 447-48, 453-54. Dave Dhillon also testified that there was a meeting among himself, Suki Badh and Tim Carpenter in July 2002 where he and Suki Badh asked Tim Carpenter to transfer shares to Plaintiff and to Gurdial Badh. Tr. 116-118. However, there was no corroborating evidence offered to support such testimony, and Dave Dhillon's testimony in this regard was effectively impeached. Suki Badh testified that no such meeting occurred. Tr. 496-97. Moreover, Tim Carpenter testified as a disinterested witness that no such meeting ever occurred. Tr. 440-41. The Court finds that these inconsistencies were never resolved and that they weigh in favor of discounting Dave Dhillon's credibility on the subject of when and whether there was a contract or agreement that allowed his father to invest in the BBC Companies.

60.    In July 2002, without authorization, Dave Dhillon via email correspondence unilaterally asked Tim Carpenter, corporate counsel for the BBC Companies, to draft

papers to reflect a purported change in share distribution with respect to BBC Holdings. Dave Dhillon told Mr. Carpenter that 40 of Suki Badh's shares were to be transferred to Plaintiff Bhupinder Dhillon, and the remaining 40 shares were to be transferred to Gurdial Badh.

61.     In response, Mr. Carpenter drafted an assignment of subscription to shares, share certificates corresponding to the purported change, and draft minutes of a special meeting of the board of directors of BBC Holdings approving the purported change. Before doing so, Mr. Carpenter did not talk to either director, Mr. Khela or Suki Badh, about the purported and unauthorized share transfer. The draft assignment was never executed by Suki Badh as shareholder because it was inconsistent with the actual and intended ownership structure of the BBC Companies. For the same reasons, the papers were never signed by Mr. Khela or Suki Badh in their capacity as directors, as required under the Bylaws of the company.

62.     On October 31, 2002, attorney Tim Carpenter wrote to Suki Badh enclosing the assignment documents that Dave Dhillon unilaterally had requested he prepare in order to transfer shares of BBC Holdings to Plaintiff and Gurdial Badh. Ex. 70.

63.     After learning of the unauthorized draft assignment of shares and the associated unsigned share certificates, Suki Badh contacted Mr. Carpenter. Through a resolution drafted by Mr. Carpenter, the BBC Holdings directors confirmed and ratified the original issuance of shares as set forth in the minutes of the organizational meeting.

64.     The original issuance of shares in BBC Holdings, as recorded in the February 11, 2002, Minutes of Organizational Meeting, was reconfirmed by the directors of the company in early 2003, as reflected in Mr. Carpenter's January 16, 2003, transmittal letter, which was countersigned by both directors. Ex. A-7 and Ex. 77. Both directors also signed the written Consent in Lieu of Special Meeting that similarly confirmed the original issuance of shares in BBC Holdings. Ex. A-8 and Ex. 78.

65.     The January 16, 2003, letter also was addressed to Dave Dhillon and was mailed to him at his office address.  Dave Dhillon's mailing address was correct on the letter.  He agreed that if he had seen the letter in January 2003 he would have known at that time that his father was not recognized as owning any shares in the BBC Companies.

66.     On December 23, 2004, attorney Tim Carpenter wrote to Dave Dhillon explaining that none of the assignment documents for BBC Holdings prepared at his unilateral request were ever signed by the directors or officers of the company or otherwise approved, to Mr. Carpenter's knowledge, and that in January 2003 the appropriate officers and directors had, in fact, reconfirmed the original share issuance. Ex. 76.

67.     Attorney Tim Carpenter testified regarding the transfer, issuance, or sale of any shares of stock in the BBC Companies, and stated that no such transfers could be accomplished without director approval or majority vote of all shareholders pursuant to the By-Laws of each company.  (Exs. 6 and 7.)

68.     Attorney Tim Carpenter testified that Ex. 29 was a document created by his assistant, not at his direction, and that it was inaccurate and did not correctly describe the share distribution of stock in BBC Broadcasting or BBC Holdings at any time.  Dave Dhillon attempted to bolster his testimony about whether his father invested in the BBC Companies by relying on this ledger.  The ledger that was not approved by attorney Tim Carpenter or any director or shareholder of either of the BBC Companies should be afforded little weight on the question of stock ownership.

## N.     Plaintiff's Claims and Evidence at Trial

69.     In his Complaint, Plaintiff alleged that he "invested" $400,000 of funds in the BBC Companies in return for 40% of their shares of stock.  Ex. A-1.  Plaintiff asserted claims for breach of contract and breach of duty.  Plaintiff's late-asserted claims for fraud and violation of the Washington State Securities Law, minority shareholder oppression, and declaratory judgment were dismissed as untimely and otherwise

improperly asserted, based in part on the fact that Plaintiff has asserted them in a state court action pending in Whatcom County Superior Court, which action includes Mr. Khela and three individual defendants not named in this case. Dkt. 60.

70. Prior to filing his Complaint, Plaintiff and immediate members of his family had asserted various other theories regarding the $400,000, each of which is either inconsistent with, or contradictory to, his theory in this case. As described in Finding No. 51 above, in the summer of 2005, attorneys in British Columbia who identified themselves as "solicitors" for Plaintiff wrote to Jasbir Badh, Gurdial Badh, Suki Badh, Ajit Badh, and Surinder Badh alleging that the transfer of $300,000 in funds was a loan to those individual bearing 14% interest, and demanding repayment of the "loan." These solicitors alleged that Plaintiff had made "repeated requests for repayment" before they wrote their June 9, 2005, demand letter, and they threatened to commence litigation if repayment was not made. Ex. A-15. Those same solicitors wrote again in July 2005, demanding repayment of the "loan" purportedly made by Plaintiff to these five individuals, and enclosed documentation described as evidence of the "loan." Ex. A-17. None of the five individuals named in these demand letters was ever named as a defendant in Plaintiff's Complaint, even though the documentation enclosed with Ex. A-17 was offered as evidence at trial in this case. Ex. 42. It was established at trial that neither of these demand letters from the British Columbian solicitors ever was withdrawn by anyone acting on behalf of Plaintiff.

71. Further, as described in Finding No. 52 above, in the spring of 2005, Plaintiff's son Dave Dhillon commenced a lawsuit in British Columbia against the BBC Companies, Sher-E-Punjab Radio Broadcasting, Inc., Rajinder Singh Saini, Jasbir Badh, Surinder Badh, Suki Badh, Ajit Badh, Gurdial Badh, and Mr. Khela alleging that the transfer of $400,000 of funds was his personal investment in the BBC Companies (i.e., not a loan or investment by his father). Ex. A-22. Seven of the eight defendants named in this British Columbia lawsuit were not named as defendants in Plaintiff's Complaint.

It was established at trial that this lawsuit in British Columbia remains pending and has not been dismissed, even though Dave Dhillon testified that the $400,000 was his father's money rather than his, and that it was an investment in the Ferndale Radio Station rather than a loan.

72.     In October 2006, yet another attorney in British Columbia who identified himself as having been retained by Plaintiff wrote to the attorney for Suki Badh indicating that he had reviewed the prior demand letters sent on behalf of Plaintiff in 2005, and requesting corporate documents in the possession of attorney Tim Carpenter.  Ex. 81.

73.     No evidence was offered at trial to suggest that anyone on behalf of Plaintiff asserted his status as a shareholder of either of the BBC Companies in any clear claim, lawsuit, or demand letter until October 2006 at the earliest.  The weight of the evidence suggests that while Plaintiff may have thought he had invested in the radio business in 2002, he did not make any claim that he was a shareholder of the BBC Companies until his lawyers learned in October 2006 of the unsigned stock certificates requested by Dave Dhillon in July 2002.  Prior to October 2006, his lawyers had claimed he loaned money to Defendants and others.

74.     No contract was entered into between Plaintiff and any of the Defendants with respect to an investment in the BBC Companies, as alleged by Plaintiff.

75.     Similarly, there was no duty breached by Defendants with respect to an investment in the BBC Companies, as alleged by Plaintiff.

76.     Plaintiff provided a total of $400,000 to his son, Dave Dhillon, which Dave used for the benefit of Radio Punjab in order to pay the company's advance to BBC Broadcasting for airtime, and which payment allowed the BBC Companies to fund the purchase price at closing.

77.     Dave Dhillon did not have express, implied, or apparent authority to transfer, sell, or issue shares in either of the BBC Companies.

78.     Plaintiff has not demonstrated that he is entitled to equitable relief and Defendants have not been unjustly enriched.  The weight of the evidence indicates that the funds provided by Plaintiff were intended to be treated as, and were applied as, an advance on lease payments due under the Radio Punjab Lease Agreement.  If Plaintiff were to recover, Defendants would suffer inequity because the money advanced by Dave Dhillon would have been used for two distinctly different purposes: lease payments on behalf of Radio Punjab and equity investments in the BBC Companies.

79.     Plaintiff never was, and never was entitled to be, a shareholder of the BBC Companies.

**O.     Miscellaneous**

80.     Plaintiff relied on Ex. 67 as evidence that he had entered into a contract to invest in the BBC Companies.  Ex. 67 is a photograph of individuals including Plaintiff and Mr. Khela taken at a celebration in honor of Radio Punjab in December 2002. Plaintiff suggested that the event was an occasion to recognize Plaintiff as an owner of the BBC Companies.  In fact, the banner in the photograph indicates that the event was for "Radio Punjab AM 1550 Appreciation." Further, one of the plaques held by the individuals in the photograph was brought into court and it indicated that the individuals were being honored "in recognition of services rendered on behalf of Radio Punjab International" by Dave Dhillon as President of Radio Punjab.  (Exs. 83 and 84.)

81.     Plaintiff also relied on Ex. 68 as evidence that he had entered into a contract to invest in the BBC Companies.  Ex. 68 is a transcript of remarks from the Radio Punjab appreciation event attributed to Suki Badh's father, Ajit Badh.  It is unclear from the text what the import of the remarks was. One interpretation that is as likely as any is that Ajit Badh was speaking of Radio Punjab and the radio station in general and was not indicating that Plaintiff was an owner of the BBC Companies.  In fact, the letters "BBC" do not appear in the transcript and neither company is mentioned by name.

82.     Plaintiff also relied on Ex. 88 as evidence that he had entered into a contract to invest in the BBC Companies.  Ex. 88 is a DVD of remarks from the Radio Punjab appreciation event attributed to Suki Badh.  Again, it is unclear from the text what the import of the remarks was. One interpretation that is as likely as any is that Suki Badh was speaking on behalf of Radio Punjab, was speaking of the radio station in general, and was not indicating that Plaintiff was an owner of the BBC Companies.

83.     When the original signed share certificates for the BBC Companies were located during trial, Plaintiff was given an opportunity to take discovery and depositions in order to ascertain the circumstances of their production and why they had not been produced before.  The testimony at trial after such discovery and depositions indicated that there was no discovery abuse and no resulting prejudice arising out of the late production.  Moreover, the certain resolution of issues surrounding the original certificates is unnecessary to the determination of the remainder of the Court's findings.

84.     There was testimony and documentary evidence to suggest that Gurdial Badh at one time was going to purchase Suki Badh's interest in one of the BBC Companies and that his name had been filed with the FCC and the Washington Secretary of State.  However, Suki Badh testified that such transaction never was consummated and that the filings would be corrected.  Tr. 717-19.  In any event, the contemplated transaction was first considered in 2007, well after the relevant period in this case.

## V.  CONCLUSIONS OF LAW

1.     The Court has jurisdiction over the subject matter and parties to this action, and venue is proper.

2.     The burden of proof is Plaintiff's to establish all the elements of his claims. Weighing all of the evidence and assessing its credibility, the Court concludes that the burden of proof has not been carried with regard to the claims asserted in this case.

3.     Dave Dhillon had neither express, implied, nor apparent authority to contract with Plaintiff on behalf of either BBC Broadcasting or BBC Holdings.

4.     No contract was entered into between Plaintiff and any of the Defendants with respect to an investment in the BBC Companies. Plaintiff has failed to establish the elements of estoppel.

5.     No duty was owed to Plaintiff by any Defendant to issue, transfer, or otherwise convey shares in the BBC Companies. No such duty was breached entitling Plaintiff to the injunctive, monetary, or equitable relief sought. No duty was owed by Mr. Khela to Plaintiff to hold his shares in BBC Broadcasting in trust for the benefit of Plaintiff.

6.     Third-party Defendant Dave Dhillon did not have express authority, implied authority, or apparent authority to transfer, sell, or issue shares in either of the BBC Companies.

7.     Plaintiff is not entitled to equitable relief.

8.     Defendants are entitled to judgment in their favor and dismissal of all claims with prejudice.

## VI. ORDER

Therefore, it is hereby

ORDERED that, consistent with the Findings of Fact and Conclusions of Law stated herein, the Clerk of the Court shall enter judgment in favor of Defendants.

DATED this 8th day of April, 2009.


_____
BENJAMIN H. SETTLE
United States District Judge